UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| RAYMOND L. STEVENS, JR., | CASE NO. 5:12CV1105 |
| Plaintiff, | MAGISTRATE JUDGE GEORGE J. LIMBERT |
| v. | |
| CAROLYN W. COLVIN[1], ACTING COMMISSIONER OF SOCIAL SECURITY, | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | |

Raymond L. Stevens, Jr. ("Plaintiff") seeks judicial review of the final decision of Carolyn W. Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"), denying his application for Disability Insurance Benefits ("DIB"). ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed and Plaintiff's complaint is dismissed with prejudice:

I. **PROCEDURAL AND FACTUAL HISTORY**

On May 22, 2008, Plaintiff applied for DIB, alleging disability beginning July 13, 2007. Tr. at 87-90. Plaintiff's date last insured is December 31, 2013.[2] Tr. at 107. The SSA denied Plaintiff's application initially and on reconsideration. Tr. at 68-69. On March 3, 2009, Plaintiff requested an administrative hearing. Tr. at 80. On July 23, 2010, an ALJ conducted an administrative hearing *via* video conference where Plaintiff was represented by counsel. Tr. at 29-67. At the hearing, the ALJ accepted the testimony of Plaintiff and Mark Anderson, a vocational expert ("VE"). On September 16, 2010, the ALJ issued a Decision denying benefits. Tr. at 15-32. Plaintiff filed a

---

[1] On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security, replacing Michael J. Astrue.

[2] The ALJ incorrectly concluded that Plaintiff's DLI was December 31, 2012. Tr. at 20.

request for review, and, on April 10, 2012, the Appeals Council denied Plaintiff's request for review. Tr. at 1-3.

On May 3, 2012, Plaintiff filed the instant suit seeking review of the Decision. ECF Dkt. #1. On September 28, 2012, Plaintiff filed a brief on the merits. ECF Dkt. #12. On December 12, 2012, with leave of court, Defendant filed a brief on the merits. ECF Dkt. #14. Plaintiff filed hi reply brief on December 21, 2012. ECF Dkt. #15.

**II.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION**

The ALJ determined that Plaintiff suffered from degenerative disc disease and major depressive disorder, which qualified as medically determinable impairments under 20 C.F.R. §404.1520(c). Tr. at 16. The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525 and 404.1526 ("Listings"). Tr. at 16.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work as defined in 20 C.F.R. 404.1567(a), except Plaintiff is limited to lifting and carrying ten pounds occasionally and five pounds frequently and walking two hours in an eight-hour workday; Plaintiff requires a sit/stand option; Plaintiff can occasionally climb (but no ladders, ropes, or scaffolds), and occasionally balance, stoop, kneel, crouch, and crawl; Plaintiff can frequently reach, handle, finger, and feel; Plaintiff can occasionally reach overhead; Plaintiff is limited to routine tasks with no fast pace and few changes in procedure; and Plaintiff is limited to superficial interaction with others. Tr. at 18.

The ALJ ultimately concluded that, although Plaintiff could not perform his past relevant work as a bricklayer journeyman, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including that of patcher, inspector, and machine tender. Tr. at 22. As a consequence, the ALJ concluded that Plaintiff had not been under a disability as defined by the SSA and was not entitled to benefits. *Id.* at 23.

### III.  STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits. These steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2. An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see 20 C.F.R. § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4. If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5. If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992). The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step. *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

### IV.  STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability. This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards. *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted). An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted). The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion. *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V.     ANALYSIS

Plaintiff asserts two arguments in his brief on the merits. First, Plaintiff asserts that the ALJ lacked substantial evidence to support his conclusion that jobs were available in significant numbers in the national economy because the VE's testimony regarding the sit/stand option conflicted with the Dictionary of Occupational Titles ("DOT"), and the ALJ did not elicit a reasonable explanation for the conflict before relying on the VE's testimony. Second, Plaintiff contends that the ALJ erred in his credibility determination when he failed to properly characterize the evidence in the record when he rejected Plaintiff's testimony.

### A.     **Plaintiff's testimony at the hearing**

Plaintiff, who was forty-four years of age on the date of the hearing and lived with his wife and two-year-old daughter, testified that he experiences constant back pain since he was injured at work on July 13, 2007. Tr. at 36. Medication "knocks the edge off" but does not fully resolve his pain. Tr. at 36, 43. Plaintiff testified that he sits in a recliner with his legs elevated and changes positions throughout the day. Tr. at 36. Plaintiff can stand for ten to twenty minutes at a time. Tr. at 37. He can walk for ten to twenty minutes at a time, however he experiences swelling in his hands and feet. Tr. at 37-38. The amount of time Plaintiff can sit varies upon his position. Tr. at 38.

Plaintiff perspires when he becomes uncomfortable. Plaintiff testified that he experiences discomfort from virtually any activity, and that the discomfort increases with increased activity. Tr. at 39. He experiences a lot of hip pain, and his legs give out "quite a bit." Tr. at 42. Plaintiff also experiences weakness and tingling in his hands and feet. Tr. at 41. Plaintiff testified that he can lift a gallon of milk, but that he has been "dropping stuff quite a bit." Tr. at 39. Plaintiff is unable to manipulate small objects and he described the sensation in his hands as having "big thick gloves on." Tr. at 41. Plaintiff also experiences daily tremors and shaking when he lies flat. Tr. at 43. He experiences sharp stabbing pains in the middle part of his back when he reaches overhead.

Plaintiff testified that he is tired all day because he has difficulty sleeping. Tr. at 40. He testified that he only sleeps for fifteen or twenty minutes at a time. On a good night, Plaintiff sleeps about two hours. Plaintiff takes approximately three or four "little power naps" a day. Tr. at 40.

Plaintiff described his depression as "an ongoing battle." Tr. at 43. Plaintiff testified that he is reduced to tears when he realizes that he has lost control of his body. Tr. at 44. He entertains suicidal thoughts "[a]ll the time." Tr. at 44. Plaintiff conceded that he played "Russian Roulette" in the past because he was devastated and believed that life was not worth living anymore. Plaintiff also conceded that he was taken to a psychiatric ward after an interview at the Social Security office where he admitted thoughts of suicide. Tr. at 45. At this point in the hearing, the ALJ acknowledged that Plaintiff was perspiring profusely and Plaintiff explained that he was in a great deal of pain. Tr. at 45.

Plaintiff testified that he is "definitely not the person that [he] was." Tr. at 46. He avoids contact with people because he is tired of responding to inquiries about his health. He is bothered when people offer suggestions to improve his capacity to function because he does not think anyone understands his situation. Tr. at 47.

Plaintiff testified that he has difficulty concentrating. He described himself as having "a real short attention span," which never was a problem in the past. Tr. at 47. He also suffers from frequent headaches, which can last for several days. Tr. at 48-49. He has taken aspirin and Tylenol, but nothing relieves his pain. Tr. at 49.

-5-

Plaintiff further testified that he has "people following [him] all the time." Tr. at 48. He stated, "I can't even sit outside and watch my daughter play on the playset without people sitting across the street with cameras and video cameras, video taping my daughter playing and watching me also. Well, I'm sure they're there for me. But it's become very, very aggravating and that makes me very angry, very angry." Tr. at 48. Plaintiff's Worker's Compensation claim was pending as of the date of the hearing, and, as a consequence, Plaintiff may have been under surveillance during the investigation of his claim. Tr. at 51. He testified later in the hearing that he has photographs of people sitting in front of his residence video taping him. Tr. at 57. The ALJ asked Plaintiff if he had seen or heard things that were not really there. Tr. at 46. He responded that he had been awakened by loud noises that his wife did not hear.

As of the date of the hearing, Plaintiff did not perform any housework, with the exception of preparing cereal and fruit for his daughter for breakfast. Tr. at 53. However, it is important to note that Plaintiff provided daily care for his daughter for the first ten months of her life until she became too heavy for him to carry. Tr. at 50.

Plaintiff described his daily activities as follows: His wife and daughter leave the house at 7:30 a.m. and Plaintiff spends the rest of the day in his recliner. He watches television most of the day, and occasionally checks his home security system, which is downloaded to his computer. Tr. at 54. He testified that he has caught people at the house that he believed were "trying to break in." Tr. At 54. He testified that he "[might] go to the gas station, get [himself] a doughnut from Dunkin' Donuts." Tr. at 53. Later in his testimony, he admitted that he goes to the doughnut shop almost every morning, which is approximately one-sixteenth of a mile from his house. Tr. at 59. Plaintiff further testified that he visits his mom, who lives five or six minutes away, his dad, who lives ten minutes away, and his grandmother. Tr. at 55-56. He stated that he always stays "close to home." Tr. at 56. He occasionally buys lunch at a local fast food store when he does not feel like cooking.

### B.     **Plaintiff's medical records**

On July 13, 2007, Plaintiff was injured at work when a 35-pound cinder block fell and struck him on the shoulder, back, and buttocks area. Tr. at 206-208. Plaintiff was taken to the emergency room, where an x-ray of the lumbar spine revealed no fracture. The x-ray further revealed normal

alignment and no evidence of sponsylosis or spondylolisthesis. Plaintiff's paraspinal soft tissues were unremarkable. Tr. at 359.  According to a Workers Compensation form campleted on July 17, 2007, Plaintiff was diagnosed with a thoracic sprain/strain, and was out of work for ten days, as directed by an emergency room physician.  Tr. at 242.  Plaintiff had previously suffered an on-the-job injury in 1992 when he fell eighteen feet from a scaffold, sustaining a compression fracture at T12. Tr. at 190, 350.  He fell into a dump truck, hitting his left leg on the side of truck and landing on debris inside it.  Tr. at  190. The first accident caused occasional back and knee pain, as well as difficulty walking. Tr. at 350-51.

Treatment notes from primary care physician, Barbara Lohmeyer, D.O., who examined Plaintiff ten days after the accident, indicate that he experienced blood in his urine, back and knee pain, and difficulty taking deep breaths. Tr. at 309. Dr. Lohmyer's notes indicate that Plaintiff was "told by ortho that [his] knee is fine."  *Id.*  A chest x-ray taken the same day revealed fibrous dysplasia and an expansile lesion near the left ribs. Tr. at 347.  Peter B. O'Donovan, M.D. characterized the lesion as having a "lytic" appearance, suggesting a gradual decay process. Tr. at 460.

In the months following Plaintiff's accident, Dr. Lohmeyer's treatment notes indicate that he continued to report back pain and difficulty breathing. Tr. at 302-08. On August 28, 2007, a CT scan of the chest revealed fibrous dysplasia. Tr. at 346.  However, a whole body bone scan performed on September 11, 2007 showed only mild uptake in the shoulders and SI joint consistent with ongoing degenerative changes. Tr. at 343. Based on the bone scan , Michael J Smith, M.D., cleared Plaintiff for what he characterized as "work hardening," and Dr. Smith also recommended more aggressive rehabilitation.  Tr. at 296.

An MRI of the thoracic spine conducted on October 17, 2007 revealed anterior wedging of the T8, T9, T11, and T12 vertebra, all relating to his previous injury. Tr. at 433-34. Varying degrees of Schmorl's node formation and disc bulging were also indicated. Tr. at 433-34. However, there was no evidence of focal disc herniation, central canal stenosis, neural canal stenosis or intrinsic pathology of the cord. Tr. at 351. An MRI of the lumbar spine conducted on December 24, 2007

revealed moderate degenerative changes, including disc space narrowing, at the T11-T12 levels. Tr. at 342.

On January 16, 2008, Mark J. Pellegrino, M.D., diagnosed Plaintiff with posttraumatic thoracolumbar intervertebral disc disease stemming from his back injury. Tr. at 376-378.  In addition, Dr. Pellegrino opined that the injury aggravated several preexisting back problems, including thoracic segmental dysfunction, disc disease at T7-T12, and degenerative disc changes at T11-L1. Tr. at 377. Dr. Pellegrino prescribed Neurontin and concluded that Plaintiff could undergo treatment, including chiropractic treatment and therapeutic injections, and gradually progress to a strengthening and conditioning program that would allow him to return to work without restriction.

On April 4, 2008, Plaintiff was evaluated by Alan H. Wilde, M.D. on behalf of Worker's Compensation. Tr. at 351-355. Plaintiff complained of thoracic spine pain extending to his low back on his left side, but was not taking any medication or undergoing any physical therapy or other treatment at that time.  Tr. at 350-51. Upon examination, Dr. Wilde found that Plaintiff walked without a limp, had no local tenderness or sensory loss or sign of radiculopathy, no upper extremity muscle weakness and no measurable atrophy of his arms, forearms, calves or thighs, and no motor deficits in his upper and lower extremities. Tr. at 352.

Dr. Wilde diagnosed Plaintiff with thoracic strain and some limitation of rotation of his thoracic area, consistent with the diagnosis of thoracic sprain. Tr. at 352. He opined that there was no objective clinical evidence to support the allowance of Plaintiff's claim regarding post-traumatic thoracolumbar intervertebral disc disease, aggravation of pre-existing thoracic segmental dysfunction and disc disease T7-T12, aggravation of previous T11-L1 disc degenerative changes, causalgia, regional pain syndrome, and paresthesias. Tr. at 353-354. Noting that Plaintiff had extensive physical therapy and work hardening, he indicated that no further treatment was necessary. Tr. at 352.

Plaintiff was referred by his family physician to Anil M. Parikh, M.D. for a psychiatric evaluation on April 24, 2008. Tr. at 579-80. Plaintiff reported that his back pain and resulting limitations caused symptoms of depressed mood, insomnia, low energy, irritability, social isolation, withdrawal, and suicidal ideations. Tr. at 579. Dr. Parikh noted that these symptoms related to his

-8-

work-related injury and to financial stress from being unable to work. Tr. at 579. Dr. Parikh provided an Axis I diagnosis of major depressive disorder "directly caused by work-related injury" and at Axis IV indicated moderate psychosocial stressors existed. Tr. at 580. He assigned a Global Assessment of Functioning ("GAF") score of 50, treating with psychotherapy and prescribing Cymbalta. Tr. at 580-82.

On May 22, 2008, Plaintiff was transported to the emergency room after exhibiting symptoms of depression while at the SSA office. Tr. at 384, 581-82. Attending physician Sharhabeel M. Jwayyed, M.D. summarized the events leading up to his emergency treatment:

> [Plaintiff] was at Social Security Administration when he was telling them that he was very depressed since he lost his job due to a Worker's Comp injury and a spinal cord injury. While at the Social Security office, they felt that he needed to be transported to the hospital because of his depression. The patient denies any suicidal ideation or homicidal ideation. He states that is [sic] main problem is just that he is in chronic pain and he is unable to work, unable to bring in an income. He is not suicidal, however. He questions what his worth is, but that is part of his depression.

Tr. at 382.

Following treatment at the emergency room's psychiatric ward, Plaintiff continued psychotherapy sessions with Dr. Parikh and his colleagues, who noted continued symptoms including "fears he is having about 'not being a man' and not being able to provide as a father." Tr. at 582. Individual psychotherapy notes reflect that Plaintiff was usually alert and oriented times three at his sessions. Tr. at 581-94, 605-07, 621-35, 641-42. Plaintiff noted that he is home all day with his daughter, Tr. at 581, buys formula and diapers for her, Tr. at 582, and manages his household. Tr. at 584.

Dr. Parikh consistently reported that Plaintiff exhibited no evidence of psychosis. Tr. at 587-88, 591, 593-94, 606, 621-24, 626, 628-30, 632-34, 641-43, that Plaintiff felt that the counseling was helping him, and that appropriate treatment had prevented further decompensation and hospitalization. Tr. at 591, 594, 605-07, 621-22, 624-26, 628-35, 643. Plaintiff's therapist also indicated that he reported improvement in his mood and in his ability to decrease negative cognitions with the help of medication and behavioral and cognitive techniques. Tr. at 593, that he reported some improvement with treatment in reducing the severity of his symptoms, Tr. at 605, that his judgment and insight were fair to good, and that his cognition appeared to be intact. Tr. at 606.

In May of 2008, Dr. Parikh prescribed Seroquel 25 mg. at bedtime. Tr. at 581. Approximately one week later, Plaintiff informed Dr. Parikh that he was suffering headaches that he attributed to Seroqeul, so Dr. Parikh prescribed Zyprexa 2.5 mg. at bedtime. In June of 2008, Dr. Parikh increased Plaintiff's dosage of both prescriptions over the course of his treatment. Tr. at 583-584. On at least two occasions in 2008, Plaintiff was not compliant with his prescribed medications. Tr. at 582-583.

Margaret Zerba, Ph.D., performed a consultative psychological evaluation for the SSA on August 7, 2008. Tr. at 462-68. Dr. Zerba noted that Plaintiff "appeared depressed and angry with flat affect." Tr. at 464. She provided an Axis I diagnosis of major depressive disorder with psychotic features and assigned a GAF score of 40. Tr. at 467. Due to Plaintiff's problems with depression, anger, sleeplessness, self-esteem, and frequent suicidal ideation, Dr. Zerba concluded he was markedly impaired in his ability to relate to others in the work environment. Tr. at 467. Similarly, she concluded he was markedly impaired in his ability to withstand daily work stress. Tr. at 647.

On September 12, 2008, Joan Williams, Ph. D., reviewed Plaintiff's case file and completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique. Tr. At 469-86. Dr. Williams concluded that Plaintiff's psychological impairments moderately limited his ability to socially interact with the general public, to accept and respond to supervisors' criticism, and to respond appropriately to workplace changes. Tr. at 470. In terms of functional limitations, Dr. Williams opined that Plaintiff's ability to perform his daily life activities was mildly limited, and moderate difficulties existed with respect to social functioning and maintaining concentration, persistence, or pace. Tr. at 483.

Diane Manos, M.D., a second non-examining physician, completed a Physical Functional Capacity Assessment on September 16, 2008. Tr. at 487-94. Dr. Manos concluded Plaintiff could lift and carry ten pounds frequently and twenty pounds occasionally. Tr. at 488. She further opined that Plaintiff could stand and/or walk for as many as six hours in an eight-hour workday with only a normal number of breaks necessary; similarly, she concluded that he could sit for six hours in an eight-hour workday, again with only normal break time. Tr. at 488. According to Dr. Manos,

Plaintiff could occasionally climb ramps and stairs but could never climb ladders, ropes, or scaffolds Tr. at 489.

Plaintiff presented to the Ohio Rehab Center for an electrocardiogram and a nerve conduction study on September 30, 2008. Tr. at 561-63. Arsal Ahmad, M.D., interpreted the results of these tests and concluded that the results were abnormal, revealing evidence of left-sided median neuropathy. Tr. at 561. Dr. Ahmad found that Plaintiff's ability to stoop and crouch were limited. Tr. at 489.

Plaintiff continued to treat with Dr. Lohmeyer, complaining of persistent back pain despite losing weight and attempting exercise. Tr. at 617. On May 11, 2009, Rafik M. Khalil, M.D., conducted cervical spine and thoracic spine x-rays, the latter of which indicated mild lower thoracic degenerative disc disease. Tr. at 615-16. Dr. Lohmeyer diagnosed Plaintiff with radiculopathy, and multiple physical exams indicated a restricted range of motion and decreased muscle strength. Tr. at 611-613.

On June 2, 2009, a CT scan of the cervical spine was performed, indicating large posterior spurs with associated central stenosis and bilateral foraminal stenosis at the C6-C7 level. Tr. at 610. Additionally, right posterior spurs existed which narrowed the right lateral recess and right neural foramen. Tr. at 610. On July 2, 2009, Plaintiff underwent a battery of tests, including an MRI of the lumbrosacral spine, an MRI and x-ray of the cervical spine, and x-rays of the thoracic spine. Tr. at 597-610. The lumbrosacral spine MRI showed mild, chronic anterior wedging of the T12 vertebra. Tr. at 601-02. The thoracic spine x-rays produced similar findings. Tr. at 599-600. The cervical spine x-rays revealed degenerative disc space.

On July 28, 2009, Plaintiff saw Dane J. Donich, M.D., who reported that Plaintiff's pain was less symptomatic in his low back radiating bilaterally to his hips, gluteal area and proximal lower extremities. He found that Plaintiff's motor exam revealed mild weakness diffusely throughout his upper extremities but that his strength was at least 4/5. He found no clear focal areas of weakness, a full cervical spine range of motion with some pain, slow and steady gait without assistance, and mildly impaired fine motor coordination in his hands. Dr. Donich also reported that the remainder of Plaintiff's examination was unremarkable. Tr. at 595. He also indicated that Plaintiff would

-11-

likely be seeing Dr. Pellegrino for further conservative treatment, including chiropractic treatment. Tr. at 595.

### C.     The sit/stand option and the DOT

In his first argument, Plaintiff contends that the ALJ erred in adopting the VE's imposition of a sit-stand option because the VE, and, as a consequence, the ALJ, did not provide a sufficient explanation for the alleged conflict between the sit/stand option and the DOT, which does not include any reference to occupations with a sit/stand option. Plaintiff writes:

> The ALJ in this case attempted to elicit such a response, but the VE explained the discrepancy simply by saying "these are the jobs that we use when someone needs a sit-stand option." No professional expertise was provided, and no specific examples were cited. The explanation itself – which was really an explanation as to why the VE cited certain DOT occupations, not an explanation of any conflicts therewith – was ambiguous at best (presumably, the word "we" was referring to the VEs testifying at the social security hearings.)
>
> Without a conflict explanation from the VE, the ALJ still could have availed himself to the use of the conflicting VE testimony had he searched for a reasonable explanation from another evidentiary source in the record. SSR 00-4p at *2-3 (listing an illustative sampling of evidence that can be used to provide a reasonable explanation for DOT-VE testimony conflicts). The ALJ, however, relied solely upon VE testimony to reach his five-step conclusion.

ECF Dkt. #12 at p. 11.

Social Security Ruling 00-4p establishes that before an ALJ may rely on information provided by a VE, the ALJ must determine whether the VE's testimony conflicts with information listed in the DOT, and if so, the ALJ must seek a reasonable explanation for the conflict from the VE and then explain the resolution of such conflict in his/her written decision. SSR 00-4p. However, courts throughout this circuit have repeatedly found that while the DOT does not explicitly refer to the sit/stand option, a vocational expert's opinion regarding such an option does not contradict the DOT.

For example, in *Jones v. Social Security Administration*, the Middle District of Tennessee reasoned:

> [I]t is plainly within the vocational expert's realm to offer an opinion, based on personal experience and review of other sources, as to the availability of jobs identified in the Dictionary of Occupational Titles ("DOT") and capable of allowing the option to sit or stand at will, even though the DOT does not itself recognize any particular job's amenability to a sit/stand option as such. It has been held that no conflict between the testimony of the expert and the DOT is created by the mere

-12-

>imposition of a sit/stand option, such that would require resolution by the ALJ in order to pass muster.

No. 3:09–0951, 2011 WL 766974, at *8 (M.D.Tenn. Feb.25, 2011)(internal citations omitted), report and recommendation adopted sub nom. *Jones v. Astrue*, No. 3:09–0951, 2011 WL 900032 (M.D.Tenn. Mar.15, 2011). See *Bennett v. Astrue*, No. 5:07CV38–J, 2008 WL 345523, at *6 (W.D.Ky. Feb.7, 2008)(noting that despite the ALJ's implication that a sit/stand option was inconsistent with the DOT, such an accommodation did not actually create a genuine conflict or inconsistency with the DOT, and that the ALJ's statement was merely an acknowledgment that the DOT was silent on the issue). Additionally, the Eastern District of Michigan ruled that a vocational expert's testimony identifying jobs amenable to a sit/stand option did not contradict the DOT, but rather supplemented the information listed in the DOT. *Walton v. Comm'r of Soc. Sec.*, No. 08–13273, 2009 WL 2905952, at *9 (E.D.Mich. Sept.8, 2009). Moreover, at least one court in this district has adopted the reasoning of *Jones, supra,* in holding that testimony of a vocational expert regarding the sit/stand option does not conflict with the DOT. *Creque v. Astrue,* 2011 WL 4054859 (N.D.Ohio 2011).[3] Accordingly, Plaintiff's first argument has no merit, as the ALJ did not err in adopting the VE's testimony regarding the imposition of a sit/stand option.

### D.     Plaintiff's credibility

Next, Plaintiff contends that the ALJ improperly assessed his credibility. Plaintiff writes, "In the instant case, [Plaintiff] does not allege that the ALJ failed in his obligation to evaluate record evidence in making a claimant credibility determination. [Plaintiff] alleges instead that the ALJ's claimant credibility analysis obfuscates the true nature of the record evidence, attempting to develop

---

[3] Generally, cases finding an inconsistency between the VE's opinions and the DOT involve situations where the VE's testimony directly contradicts information listed in the DOT. See *Austin v. Comm'r of Soc. Sec.*, No. 3:09–CV–723, 2010 WL 1170630, at *3 (N.D.Ohio Mar.23, 2010) (finding a conflict between the VE's testimony and the DOT when the VE identified a job as being "unskilled" whereas the DOT labeled the position as "semiskilled"); see also *Kyle v. Comm'r of Soc. Sec.*, 609 F.3d 847, n. 9 (6th Cir.2010) (citing *Austin* as an example of a case where the VE's testimony conflicted with the description of a job listed in the DOT). Conversely, the Sixth Circuit has found that the VE's testimony is not contradictory to the DOT even where the VE identifies classifications of jobs which do not specifically appear in the DOT. See *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601 (6th Cir.2009) ("The fact that [the VE's] description of a production-inspector job does not align perfectly with the DOT's listed occupation titles should not be surprising given that 'the DOT contains information about most, but not all, occupations.'").

-13-

substantial evidence where none exists." ECF Dkt. #13 at p. 13. In support of this argument, Plaintiff cites *Lawson v. Astrue*, 695 F.Supp.2d 729 (S.D. Ohio 2010). In that case, the Court rejected the ALJ's conclusion that Plaintiff was capable of full time work because the ALJ relied upon "somewhat minimal daily functions." *Id.* at 737. In actuality, the plaintiff in *Lawson* testified that she was able to drive a couple of times per week, that she could perform housework occasionally, and that she saw her daughter a couple of times a week. However, the ALJ in *Lawson* mischaracterized the foregoing testimony, writing that the plaintiff "had been able to do housework, pursue pasttimes [sic] such as crafts, reading and video games, watch her grandchild, drive, and shop." *Id.*

Plaintiff contends that the ALJ in the above-captioned case similarly mischaracterized the evidence in the record. Here, the ALJ wrote:

> [Plaintiff's] activities show that he is not as limited as asserted. [Plaintiff] testified that he goes to the donut shop daily and drives to visit his family. He also stated that he uses the internet and is able to help get his daughter ready for daycare. [Plaintiff] was also mentally able to take care of his daughter until she became too heavy for him to carry her all of the time. He reported in 2008 that he was able to take care of their seven-month-old daughter most of the day, including changing diapers, feeding her, and reading to her. (Exhibit 5E). These factors suggest that [Plaintiff] would be capable of concentration for simple, routine work with superficial interaction as well as a sedentary job with a sit/stand option. Children generally require physical activity such as some walking and standing in addition to lifting/carrying, and [Plaintiff] primarily noted the lifting as the reason for not being able to take care of his daughter.

Tr. at 20.

The social security regulations establish a two-step process for evaluating pain. *See* 20 C.F.R. § 416.929. In order for pain or other subjective complaints to be considered disabling, there must be (1) objective medical evidence of an underlying medical condition, and (2) objective medical evidence that confirms the severity of the alleged disabling pain arising from that condition, or objectively, the medical condition is of such severity that it can reasonably be expected to produce such disabling pain. *See id.; Stanley v. Secretary of Health and Human Services*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky v. Bowen*, 35 F.3d 1027, 1038-1039 (6th Cir. 1994); *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986). Therefore, the ALJ must first consider whether an underlying medically determinable physical or mental impairment exists that

-14-

could reasonably be expected to produce the individual's pain or other symptoms. *See id.* Secondly, after an underlying physical or mental impairment is found to exist that could reasonably be expected to produce the claimant's pain or symptoms, the ALJ then determines the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to do basic work activities. *See id.*

When a disability determination that would be fully favorable to the plaintiff cannot be made solely on the basis of the objective medical evidence, as Plaintiff appears to concede here, an ALJ must analyze the credibility of the plaintiff, considering the plaintiff's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. *See* SSR 96-7p, 61 Fed. Reg. 34483, 34484-34485 (1990). These factors include: the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any pain medication; any treatment, other than medication, that the claimant receives or has received to relieve the pain; and the opinions and statements of the claimant's doctors. *Felisky*, 35 F.3d at 1039-40. Since the ALJ has the opportunity to observe the claimant in person, a court reviewing the ALJ's conclusion about the claimant's credibility as to pain should accord great deference to that determination. *See Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir.1993). Nevertheless, an ALJ's assessment of a claimant's credibility as to pain must be supported by substantial evidence. *Walters v. Commissioner of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Contrary to Plaintiff's assertion, the ALJ did not improperly characterize the evidence in the record. Plaintiff testified that he took daily trips to the doughnut shop and frequently visited his relatives. Moreover, Plaintiff testified that he provided day care for his infant daughter for the first ten months of her life. Based upon the foregoing evidence, the ALJ rejected Plaintiff's testimony regarding the limitations he suffers as a result of his pain.

Furthermore, Plaintiff's reliance on *Lawson* is misplaced. The plaintiff in *Lawson* suffered from fibromyalgia. The testimony of a claimant with fibromyaglia must be given special consideration due to the fact that there is no objective criteria for the diagnosis of fibromyalgia. See *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 818 (6th Cir.1988). The ALJ in *Lawson*

discredited the plaintiff's testimony based upon a lack of objective evidence. *Lawson* at 737. The same is not true in this case. Here, the objective medical evidence establishes only minimal impairment. Accordingly, the ALJ did not err in assessing Plaintiff's credibility.

## VI. CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: April 23, 2013

                                        */s/George J. Limbert*
                                        GEORGE J. LIMBERT
                                        UNITED STATES MAGISTRATE JUDGE